UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

PATRICK ERIC HAMPTON,

    Petitioner,

v.                                                  Case No. 12-C-186

WARDEN JAMES SCHWOCHERT,

    Respondent.

**DECISION AND ORDER DENYING HABEAS PETITION**

On February 23, 2012, petitioner Patrick Eric Hampton ("Hampton"), filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. On March 19, 2012, United States District Judge Rudolph T. Randa ordered the respondent to file an answer or other responsive pleading. The case was then reassigned to this court based on the parties' consent to magistrate judge jurisdiction. After the respondent filed his answer, the court set a briefing schedule governing Hampton's petition. The briefing schedule was readjusted a few times due to Hampton's request for counsel (which was granted) and Hampton's requests for brief extensions of time. The petition is now fully briefed and ready for resolution. For the following reasons, the petition will be denied.

**I. PROCEDURAL BACKGROUND**

As habeas cases go, this one has a relatively simple procedural posture. On July 20, 2008, Hampton was taken into custody regarding the death of his roommate, Carlton Stovall; Hampton confessed the next day to killing Stovall while high on drugs. *State v. Hampton*, 793 N.W.2d 901, 904,

906 (Wis. Ct. App. 2010). Hampton filed a pretrial motion to suppress his incriminating statements, but the motion was denied. *Id.* at 906.

Thereafter, on November 14, 2008, Hampton was convicted, pursuant to a plea agreement, of first-degree reckless homicide. (Ex. A.[1]) He was sentenced to 25 years of initial confinement, followed by 15 years of extended supervision. (Ex. A.) Hampton appealed his conviction, challenging the trial court's denial of his motion to suppress. *See Hampton*, 793 N.W.2d at 903; *see also* Wis. Stat. § 971.31(10) (authorizing review of a motion to suppress on appeal from a final judgment entered upon a guilty or no-contest plea).

The Wisconsin Court of Appeals affirmed. *Hampton*, 793 N.W.2d at 912. As relevant here, the court found that, while Hampton unambiguously invoked his right to counsel two hours and thirty-eight minutes into the July 20 interview, he then immediately initiated further communication with the detectives and then waived his right to counsel. *Id.* at 910-11. On March 15, 2011, the Wisconsin Supreme Court denied discretionary review. (Ex. C.)

## II. FACTUAL BACKGROUND

The relevant facts concerning the July 20 and 21, 2008, police interrogations are those found by the Wisconsin Court of Appeals. *See* 28 U.S.C.A. § 2254(e)(1) (providing that, in habeas cases, "a determination of a factual issue made by a State court shall be presumed to be correct"). The Court of Appeals, in turn, took its facts from the testimony at the trial court's suppression hearing and from audio tapes of Hampton's interviews. *Hampton*, 793 N.W.2d at 904.

---

[1] All citations to exhibits refer to those attached to the respondent's answer. (ECF No. 10.)

On July 20, 2008, at approximately 2:40 p.m., Hampton was arrested, processed, and placed in a private cell at the Milwaukee Police Department until 7:20 p.m., when he was placed in an interview room and questioned by Detectives Timothy Heier and Jeremiah Jacks about Stovall's death.

Shortly after the interview began, Hampton interrupted Detective Heier, stating, "Mark told me to talk to nobody but him." Detective Heier confirmed that Hampton was referring to Detective Mark Peterson, whom Hampton knew from prior contacts. Detective Heier told Hampton that Detective Peterson's shift had ended and that he was gone for the day.

Detective Heier then resumed explaining the interview process to Hampton, when Hampton interrupted again, stating, "I know how this stuff go. I know all about this." Detective Heier confirmed that Hampton had prior arrests. Hampton then continued:

> He [Detective Peterson] told me to talk to nobody but him. . . . I know how this stuff go, OK. I really don't want to say nothing. I don't have no lawyer. And understand, like I said, he told me to say nothing. . . . I know how it go. Good cop, bad cop. . . . He told me to talk to him.

In response, Detective Heier told Hampton that Detective Peterson had directed Detectives Heier and Jacks to talk to Hampton. Hampton reiterated that Detective Peterson "told me to talk to nobody but him." Nevertheless, Hampton proceeded to respond to background questions posed by Detective Heier.

After the background questions, Detective Heier told Hampton that he needed to inform Hampton of his rights. Hampton replied that he had been given his rights before. Regardless, Detective Heier proceeded to read Hampton his *Miranda* rights. When asked if he understood his rights, Hampton answered, "Yes, sir."

Detective Heier then asked Hampton if he was willing to talk with the detectives. The audio tape does not reflect what, if anything, Hampton said or did immediately after Detective Heier's question.

3

However, a few seconds later, Hampton stated, "I really don't want to make no statement. Do I got to talk to both of you all? Or I can just talk to one of you all? . . . I'm supposed to be talking to Mark [Detective Peterson]."

Over the next few minutes, Detective Heier explained the purpose of having two detectives in the interview room. Detective Heier then again asked Hampton, "Do you want to talk to us?" Hampton replied, "I want to talk, but I don't want to talk to both" detectives. Detective Heier testified that he understood Hampton to be waiving his rights. Over the next two hours, Detective Heier questioned Hampton, and Hampton responded to the questions.

Two hours and thirty-eight minutes into the interview, Hampton interrupted Detective Heier's questions, and the following exchange occurred:

>     HAMPTON: I'm not trying to be rude or nothing. I just want to talk to a lawyer.
>     HEIER: Any specific lawyer you want us to call?
>     HAMPTON: No. I don't know.

The next twenty seconds of the audio tape reflects sounds suggesting that the detectives were packing up to leave, a suggestion confirmed by the following exchange initiated by Hampton:

>     HAMPTON: Are you guys gonna leave?
>     HEIER: Yeah. If you wanna talk to a lawyer, we're not going to talk to you. . . . You're in charge. . . . If you want a lawyer, I respect that and I'll honor that.

Detective Heier then told Hampton that a police officer was going to come in to photograph the cuts on Hampton's hands. Hampton responded, "I just don't want you guys to leave right now." Detective Heier explained to Hampton that because Hampton had requested a lawyer, the detectives could not talk to him. Detective Heier told Hampton that he could obtain a public defender if he could not afford to hire an attorney. Detective Heier also offered to reread Hampton his *Miranda* rights.

4

After taking a few minutes to consider his options, Hampton stated, "I really do want to talk to you guys . . . I just need some time." Hampton requested thirty to forty minutes alone to read the Bible, pray, and talk to God. Detective Heier granted Hampton's request, and then told Hampton, "If you want to talk to us again, we'll talk to you again." Hampton replied, "I do. I do. I really do. I just need some time." Detective Heier then stopped the interview (it was 10:32 p.m.), gave Hampton a Bible, and left.

The interview resumed an hour later when Detective Heier alone met with Hampton in the interview room and reread Hampton his *Miranda* rights. When asked if he understood those rights, Hampton responded, "Yes, sir." The following exchange then occurred:

    HAMPTON:   I don't want to say the wrong thing. I don't want to say the wrong thing.
    HEIER:     Do you want to talk to me?
    HAMPTON:   I guess I'll talk about some things.

The interview continued for another hour, until Hampton announced, "I just don't want to talk right now." Shortly thereafter, Hampton added, "I want to talk to you again." But at that point, five hours after the interview began, Detective Heier ended the interview, and Hampton was returned to his private cell, having made no incriminating statements.

The next day, July 21, at 2:47 p.m., fourteen hours after the first interview had ended, Detective Peterson, accompanied by Detective Billy Ball, interviewed Hampton about Stovall's death. Detective Peterson read Hampton his *Miranda* rights at the outset of the interview. Hampton indicated that he understood his rights and answered, "Yes, sir," when asked if he agreed to waive his rights and to speak to the detectives about the homicide. Thereafter, Hampton admitted to killing Stovall while high on drugs.

5

## III. STANDARD OF REVIEW

Habeas relief does not lie for a claim "adjudicated on the merits in State court proceedings" unless the state court decision was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law," or (2) "based on an unreasonable determination of the facts." 28 U.S.C. § 2254(d). Here, Hampton alleges that the Wisconsin Court of Appeals's decision was an unreasonable application of clearly established federal law.

A state court's decision is an "unreasonable application" of clearly established federal law if the state court identified the correct legal rule but unreasonably applied the controlling law to the facts of the case. *Williams v. Taylor*, 529 U.S. 362, 407 (2000). It should be noted that "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Id.* at 410. Rather, "unreasonable" means that a state court's decision lies "well outside the boundaries of permissible differences of opinion." *Hardaway v. Young*, 302 F.3d 757, 762 (7th Cir. 2002). Put differently, to issue the writ, there must be "no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedents." *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011).

## IV. DISCUSSION

The issue here is whether a state court finding—namely, that after Hampton unambiguously invoked his right to counsel two hours and thirty-eight minutes into the July 20 interview, he then immediately initiated further communication with the detectives and then waived his right to counsel—was an unreasonable application of clearly established federal law—namely, *Oregon v. Bradshaw*, 462 U.S. 1039 (1983), and *Edwards v. Arizona*, 451 U.S. 477 (1981).[2]

---

[2] Hampton originally also objected to the state court determination that he did not unambiguously request counsel at the outset of the July 20 interrogation. (Op. Br. at 9.) Hampton later argued, however, that because the respondent conceded that Hampton invoked his right to

6

In *Edwards*, the Supreme Court held that, after a custodial suspect invokes the *Miranda* right to counsel, police may question the suspect without a lawyer only if: (1) the suspect "initiates further communication, exchanges, or conversations with the police;" and (2) under the totality of the circumstances, the suspect makes a "knowing and intelligent" waiver of the previously invoked right to counsel. 451 U.S. at 484-86 & n.9. In *Bradshaw*, eight of the nine Justices reaffirmed the *Edwards* two-step analysis. 462 U.S. at 1054 n.2 (Marshall, J., dissenting). But those eight Justices were split on the meaning of "initiate" in the first step. *Id.*

The plurality in *Bradshaw* concluded that the suspect "initiates" further dialogue if he "evince[s] a willingness and a desire for a generalized discussion about the investigation." 462 U.S. at 1045-46. The dissent in *Bradshaw* defined "initiates" more narrowly to mean "reopen[] the dialogue about the subject matter of the criminal investigation." 462 U.S. at 1054.

To repeat, at the two hour and thirty-eight minute mark, Hampton made an unambiguous request for a lawyer. When the detectives started packing up to leave, Hampton asked, "Are you guys gonna leave?" Detective Heier answered in the affirmative, telling Hampton that the detectives would respect Hampton's request for a lawyer. Detective Heier then told Hampton that a police officer was going to come in to photograph the cuts on Hampton's hands. Hampton responded, "I just don't want you guys to leave right now." Detective Heier reiterated that, because Hampton had requested a lawyer, the detectives could not talk to him and offered to reread Hampton his *Miranda* rights.

After a few minutes, Hampton stated, "I really do want to talk to you guys . . . I just need some time." Detective Heier granted Hampton's request and then told Hampton, "If you want to talk to us

counsel at the 2:38 mark (Resp. Br. at 18), the "ultimate question" is simply whether Hampton waived that right by initiating further conversation with law enforcement. (Reply Br. at 1.)

7

again, we'll talk to you again." Hampton replied, "I do. I do. I really do. I just need some time." Detective Heier then stopped the interview and left. The interview resumed an hour later when Detective Heier alone met with Hampton and reread Hampton his *Miranda* rights. When asked if he understood those rights, Hampton responded, "Yes, sir."

The Wisconsin Court of Appeals interpreted this exchange as follows:

> Under either test set forth in *Bradshaw*, the culmination of Hampton's statements with detectives from "I just don't want you guys to leave right now" and ending with "I really do want to talk to you guys," demonstrates an initiation of communication with the detectives. It is reasonable to conclude that Hampton wished to continue talking about the circumstances surrounding Stovall's death, as that had been the focus of his conversation with the detectives for several hours. Detectives honored Hampton's request for a thirty to forty minute break to read the Bible and pray before continuing to speak with detectives, and Detective Heier reread Hampton his *Miranda* rights before continuing to interrogate him an hour later. At that time, Hampton acknowledged that he understood his rights and expressly waived them before talking with the detectives.

*Hampton*, 793 N.W.2d at 911.

While Hampton's statements might reasonably be viewed as vague, considering the context in which they were made, the statements might also reasonably be viewed as a request to discuss the investigation further—that is, Hampton didn't want the detectives to leave because he didn't want their conversation about the case to end. Indeed, "because even the broaching of a subject relating 'indirectly' to the case against the suspect is sufficient [under the plurality opinion in *Bradshaw*], the courts have tended to find that the 'initiation' prong . . . has been satisfied even in cases in which any link between the accused's comment or question and the underlying investigation is less than clear." *Morris v. United States*, 728 A.2d 1210, 1218 (D.C. Cir. 1999) (collecting cases). Accordingly, the Wisconsin Court of Appeals decision does not lie "well outside the boundaries of permissible differences of opinion."

8

Case 2:12-cv-00186-WEC   Filed 01/04/13   Page 8 of 11   Document 22

*Hardaway*, 302 F.3d at 762. Rather, "fairminded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedents." *Harrington*, 131 S. Ct. at 786.

In his reply brief, however, Hampton argues for the first time that when he said, "I just don't want you guys to leave right now," he was simply indicating a preference to have the detectives present while other officers photographed his hands. (Reply Br. at 2.) Forfeiture issues aside, Hampton's argument, at best, merely presents another reasonable interpretation of his statement.[3] But because Hampton never expressly stated why he didn't want the detectives to leave, the Wisconsin Court of Appeals's interpretation is also reasonable, especially when Hampton's subsequent statements are taken into consideration. In the end, I simply cannot find any evidence that the state court's decision was irrational.[4]

## V. CERTIFICATE OF APPEALABILITY

There is one final matter to address. Rule 11(a) of the Rules Governing § 2254 Cases in the United States District Courts provides, in pertinent part:

> (a) Certificate of Appealability. The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant. Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue. If the court issues a certificate, the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2). If the court denies a certificate, the parties may not appeal the denial but may seek a certificate from the court of appeals under Federal Rule of Appellate Procedure 22.

---

[3] After Hampton made this statement, Detective Heier reiterated that, because Hampton had requested a lawyer, the detectives could not talk to him and offered to reread Hampton his *Miranda* rights. If Hampton's statement was just about the photographs, he likely would have corrected Detective Heier's misinterpretation. But he didn't. On the contrary, after a few minutes, Hampton stated, "I really do want to talk to you guys . . . I just need some time."

[4] Because I find that Hampton initiated further communication with detectives after invoking his right to counsel during the July 20 interview, I need not examine whether the July 21 interview—during which Hampton confessed to killing Stovall—was sufficiently attenuated from the July 20 interview.

9

A district court may issue a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Under this standard, a petitioner must demonstrate that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Miller–El v. Cockrell*, 537 U.S. 322, 336 (internal quotations omitted).

In my opinion, Hampton is entitled to a certificate of appealability. Although this court has declined to grant Hampton his habeas corpus petition for the reasons set forth above, he has nevertheless demonstrated that jurists of reason could disagree with this court's resolution of his constitutional claim and that the issues presented are adequate to deserve encouragement to proceed further. Consequently, the court will grant Hampton a certificate of appealability on the following issue: whether the Wisconsin Court of Appeals's finding that Hampton initiated further communication with detectives after invoking his right to counsel was an unreasonable application of *Oregon v. Bradshaw*, 462 U.S. 1039 (1983), and *Edwards v. Arizona*, 451 U.S. 477 (1981).

**NOW THEREFORE IT IS ORDERED** that Hampton's petition for a writ of habeas corpus be and hereby is **DENIED**;

**IT IS FURTHER ORDERED** that this action be and hereby is **DISMISSED**;

**IT IS FURTHER ORDERED** that Hampton be and hereby is granted a certificate of appealability on the following issue: whether the Wisconsin Court of Appeals's finding that Hampton initiated further communication with detectives after invoking his right to counsel was an unreasonable application of *Oregon v. Bradshaw*, 462 U.S. 1039 (1983), and *Edwards v. Arizona*, 451 U.S. 477 (1981).

**IT IS FURTHER ORDERED** that the Clerk of Court shall enter judgment accordingly.

**SO ORDERED** this 4th day of January 2013, at Milwaukee, Wisconsin.

**BY THE COURT:**

s/ William E. Callahan, Jr.
WILLIAM E. CALLAHAN, JR.
United States Magistrate Judge
